THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. DAVID LOPEZ, Defendant-Appellant.

First District (3rd Division)   No. 1—87—3642

Opinion filed April 15, 1992.

1062

John M. Cutrone, of Chicago, for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Margaret M. Regan, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Defendant, David Lopez, was charged with murder (Ill. Rev. Stat. 1985, ch. 38, par. 9—1), aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2), and the concealment of a homicide (Ill. Rev. Stat. 1985, ch. 38, par. 9—3.1) in the death of his estranged wife, Jaynette. After a jury trial, defendant was convicted of voluntary manslaughter (Ill. Rev. Stat. 1985, ch. 38, par. 9—2) and the concealment of a homicide. He was sentenced to consecutive terms of 15 years' imprisonment for the voluntary manslaughter and five years' imprisonment for the concealment of a homicide.

On appeal, defendant asserts that (1) the trial court erred when it allowed the State to introduce evidence of the results of electrophoretic testing of dried blood samples and the victim's blood sample because the testing has not gained general scientific acceptance as being reliable; (2) the error in admitting the electrophoretic test results was compounded by the admission of statistical evidence derived from the

tests; (3) the trial court erred in imposing consecutive sentences because they were not required to protect the public from defendant; (4) the trial court erred in refusing to give defendant's tendered involuntary manslaughter instruction; (5) the trial court erred by admitting other crimes evidence, especially since the State argued in its closing argument that it showed defendant's propensity to commit crime; (6) there was insufficient information to constitute probable cause to arrest defendant, requiring the suppression of his subsequent statements; and (7) absent defendant's statements, the evidence was insufficient to convict him. We affirm.

Defendant and his wife, who had been married for four years, had one son. On May 21, 1986, Jaynette and her son were living with her sister, Kathleen Downs. Around 10 p.m., Jaynette left, wearing a black lace blouse, gray wool pants, black high heels, black purse, gray jacket, gold earrings, and a gold medallion. The next morning, Downs awoke and noticed Jaynette had not yet come home. After returning home from work, finding that Jaynette was still not home by 8 p.m., Downs called the police and filed a missing person's report. On May 24, 1986, Downs found Jaynette's car parked in an Osco parking lot at 63rd Street and Pulaski Avenue, Chicago.

When Detective Michael Duffin was assigned to the missing person investigation on May 31, 1986, he asked defendant to come to the police station for an interview. Defendant told Duffin that he and Jaynette were separated, had been living together on and off over the four years of their marriage, and the last time he saw her was on May 2, 1986, in court.

Defendant explained that Jaynette moved out with their son and stayed with relatives in February 1985, after a physical altercation. When defendant was unable to speak with Jaynette on the telephone, he became angry and shot himself in the shoulder. During that next summer, while still separated, defendant took their son to Florida and left him at an ex-girlfriend's house. Defendant returned to Illinois, told Jaynette where the baby was, and tried to force her to sign consent custody papers. Although he denied taking the baby to get his wife back, soon after he returned with their son, they lived together again.

Defendant began tape recording his wife's telephone conversations. When Jaynette discovered the tape recorder on February 13, 1986, they argued. Defendant struck Jaynette and threw the telephone at her. Jaynette and her son went to live with her sister, and on May 2, 1986, Jaynette and defendant appeared in court. Defendant stated that he pleaded guilty to a battery charge against Jaynette and

received one year's supervision. At that time, an order of protection was entered against defendant.

Defendant told Duffin that Jaynette had filed for a divorce and that there was a child custody issue. Defendant also told the police officers that he worked in his brother's auto parts business. Although he had owned a .25 caliber handgun, defendant stated, he had given it to a cousin a week earlier. Defendant refused to give the cousin's name. He admitted that he had owned another .25 caliber handgun that had been confiscated after he shot himself. Defendant also informed Duffin that he had a psychiatrist.

Defendant gave Duffin permission to search his car. After giving the detective the keys, Duffin went outside and looked through the car, but found nothing. Defendant also gave permission for the police to search his apartment and signed a consent-to-search form. Defendant left the police station alone and met the police, letting them into his apartment. Duffin searched the apartment for 1½ hours. He saw numerous articles of Jaynette's clothing and personal belongings in brown plastic bags with black linings. The police officers left without taking anything and defendant stayed in his apartment.

On June 1, 1986, at 3:03 p.m., Officer Linda Kennedy arrived at the Chicago River at 28th and Hoyne Streets, Chicago, where a body had been found facedown in the river. During an area search, Officer Dennis Veneigh, an evidence technician, found two pieces of blue plaid material, which were the same type used to tie the victim's hands and feet, approximately 140 to 150 feet from where the body was found. On cross-examination, Veneigh testified that the area where the body was found was at the end of a dead-end street, where discarded debris, including used auto parts, was located. Veneigh did not find Jaynette's purse, identification items, jewelry, or money.

At 3:30 p.m. on June 1, 1986, Detective James Mercurio observed the body in the river. It was in one foot of water, about two feet from the shore. Brown plastic bags were over the top portion of the body; the hands and feet were bound with blue and white plaid material; there were no shoes; the pockets were turned inside out; the pants were unbuttoned; a wire mesh was wrapped around the body; and an automobile cylinder was tied to the waist. Mercurio testified that blue and white plaid material, which was similar to the material tied around the victim, was found about 300 feet from the body. Blue automotive-type towels were wrapped around the plaid material.

At the morgue, Mercurio stated, he noticed that the body was wrapped in brown plastic bags with black linings. The victim was wearing a black blouse with small white dots and gray wool slacks.

During the autopsy on June 2, 1986, Mercurio observed gunshot wounds to the head. He later learned that small caliber bullets were removed from the body.

On June 2, 1986, Detective Duffin learned that a woman's body matching Jaynette's description and wearing similar clothing was found in the river. He went to the morgue to view the body. Duffin noticed that the plastic bags wrapped around the body were the same type that he had earlier seen in defendant's apartment. Duffin informed Mercurio of the plastic bags in defendant's apartment, the marital problems between Jaynette and defendant, and defendant's previous ownership of small caliber handguns. Duffin also informed Mercurio that defendant worked in an auto supply store.

After leaving the morgue, Detective Mercurio went to the victim's parked car. He noticed a playpen in the back seat and blue toweling scattered on the back seat. The toweling was similar to the blue towels found near the body. Officer Frank Gurtowski, an evidence technician, saw blue paper towels on the rear seat and rear floor and a baby's playpen in the rear seat.

Around 1 a.m. on June 3, 1986, Detective Mike Miller went to defendant's apartment. Defendant agreed to go to the police station for an interview. At the police station, he was placed in an interview room, where Miller advised defendant of his *Miranda* rights around 2:35 or 2:40 a.m. Miller then placed three colored photographs facedown on the table, telling defendant that he thought they were of Jaynette, taken after she was pulled from the river. Defendant asked to see them. When he looked at the photographs, he became distraught and began to cry. After he returned the photographs and they were placed facedown on the table, defendant composed himself and continued the interview.

Defendant told Miller that he and Jaynette had marital problems and that there was a domestic argument on February 13, 1986, during which he struck his wife with a telephone. After he was arrested, Jaynette took some of her belongings and left with their son. The last time he had seen his wife was on May 2, 1986, when they were in court on the battery charge.

The interview lasted no longer than an hour. Defendant was allowed to use the restroom, was given coffee, and was made as comfortable as possible. Miller described defendant as calm, contemplative, and reflective.

When Detective Mercurio came on duty at 8:30 a.m. on June 3, 1986, the body had tentatively been identified as Jaynette, based on the clothing description, a full upper plate in her mouth, and the

amount of time it had been in the river. At 9:45 a.m., Mercurio spoke to defendant, giving him his *Miranda* rights. Mercurio told defendant that a tentative identification had been made of Jaynette's body and that they had physical evidence that may link him to his wife's death. Defendant responded by putting his head down for a couple of moments. When he raised his head, he said, "[Y]ou know, I didn't get up off the shore *** I lied to you before *** I did kill my wife." Defendant stated that he wanted to tell what happened, but that he wanted police detective Peter La Porta, who was a friend, to be present.

About 11:05 a.m., Detectives Mercurio and La Porta spoke with defendant for about 45 minutes. Mercurio again advised defendant of his *Miranda* rights. Defendant responded, "You know, I can't live with it anymore *** I want to tell you what happened *** I killed her." Defendant related that, on the evening of May 21, 1986, he saw his wife driving her car west on 63rd Street at Pulaski Avenue. He followed her to a lounge called "Crackers," watched her park, and then parked his car down the block. He waited for his wife to go into the bar. Defendant debated whether to go into the bar, but decided to go home, where he drank three cans of beer. After buying and drinking another six-pack of beer, defendant took his .25 caliber automatic gun, got into his car, and drove to "Crackers." Because Jaynette's car was parked in the same place, defendant parked his car in a nearby restaurant parking lot. He then walked back to Jaynette's unlocked car, got into the back seat, hid under the playpen, and waited. About 10 to 30 minutes later, Jaynette came to her car with a man, who kissed her and said he would call her later.

Shortly after Jaynette drove away, defendant got up and startled her. Defendant told her to drive into the Osco parking lot at 63rd Street and Pulaski Avenue. In the parking lot, defendant stated that he wanted to talk about living together again. They began to argue, and defendant pulled out his gun, putting it to his head.

Defendant stated that Jaynette told him that he should have done a better job the last time he tried to commit suicide. When she started to call him names, he put the gun to Jaynette's head. She raised her arm and the gun went off, striking her behind the right ear. Still conscious, Jaynette slumped over against the driver's door and asked, "Why me?" Defendant apologized, saying that he had not meant it.

Defendant then moved Jaynette to his car. He began driving to Holy Cross Hospital, but he pulled over because Jaynette was crying and screaming in pain. Defendant stated that Jaynette told him to give the baby his vitamins and to "just let it happen," which defend-

ant took to mean that she wanted him to kill her. Because the first shot had been so loud, defendant wrapped the gun in his vest. He then fired several more shots into Jaynette's head, which was on his lap, until the gun jammed.

Defendant drove home and parked in the alley. He went to his apartment, got some brown and black garbage bags and masking tape, changed his clothes and put them into one garbage bag, and went back to his car. He then put the bags over Jaynette's head and taped them.

He drove back to the restaurant parking lot where he had parked earlier. On the way, defendant threw the shell casings caught in the vest, one at a time, out the car window. In the parking lot, defendant moved Jaynette's body from the front seat to his car's trunk. He found a plaid shirt on the ground and put it under Jaynette's neck in case any blood leaked out of the garbage bags.

Defendant drove home and parked his car in the alley behind his apartment. About 11 p.m. that evening, defendant drove to the river, where he took his wife's body from the trunk. At that time, blood spilled onto his pants. Defendant took the body to a clearing about 15 feet from the river. He got the plaid shirt and a cylinder head from his trunk. He tore the shirt into strips and used them to tie the cylinder head to the body and to tie her feet. He then found a piece of concrete reinforcement wire, which he rolled around the body to keep the cylinder head attached. Defendant dragged the body to the edge of the river and rolled it into the river.

When defendant returned to his car, he got the garbage bag containing his bloody clothing, the vest he used to cover the gun, Jaynette's purse, jacket, and shoes, and the blood-soaked blue toweling, which he had used on the car seat so that no blood would get on it. Defendant did not mention the gold medallion or gold earrings. Defendant put bricks into the bag and threw it into the river along with the gun and another cylinder head that had been in his trunk. Defendant stated that he had gotten the blue toweling from the auto supply store where he worked.

Because he could still see the body, defendant used a stick to push it farther into the river. Defendant stated that the blood-soaked black corduroy pants he wore that night were hanging in his closet.

At 2 or 3 p.m. on June 3, 1986, Mercurio, La Porta, assistant State's Attorney Jeanette Sublett, and assistant State's Attorney William Frost entered defendant's interview room. After Frost gave defendant his *Miranda* rights, defendant made a one-hour statement. Defendant was then left alone.

About 5 p.m., Mercurio brought consent-to-search forms for defendant's apartment and car. After Mercurio read the forms to defendant and defendant looked at the forms, defendant signed them and gave his keys to Detective Cornelison, who later conducted the searches.

During those searches, Cornelison found the black corduroy pants hanging in the closet. There appeared to be crusted blood on the front and on both cuffs. Cornelison also looked for bloodstains in defendant's car trunk and passenger compartment, but did not find any. He did not see any bullet holes in the car seat, any trails of blood, or any human tissue.

After again being given his *Miranda* rights, defendant gave a 45-minute court-reported statement at approximately 5:20 p.m., during which Mercurio, Frost, and Sublett were present. The written statement was substantially the same as the earlier oral statements. Sublett and Mercurio later brought defendant the typed statement. He read the statement, made and initialed corrections, and signed the last page. After signing, defendant stated that he felt better after finally telling someone what had happened.

During a hearing on defendant's motions to suppress, defendant testified that the statement he gave was not true. He denied telling Mercurio that he killed his wife or that he wanted to confess in front of La Porta. Defendant stated that he asked for La Porta because the police officers offered him a deal that his son would be placed with his family and that he could plead "innocent-crazy" to a crime of passion. Once La Porta arrived, defendant testified, he confessed only after Mercurio again made that same offer.

Defendant also testified that after he told Sublett that he had never been given his *Miranda* rights, she told him not to repeat that to anyone else. Defendant admitted that he had been fed, was allowed to smoke, and used the restroom every time he asked. He also admitted reading his statement, making corrections, and signing his name.

Finding that defendant had voluntarily gone to the police station and that the arresting officer had probable cause to arrest defendant, the trial court denied the motions to quash arrest, suppress evidence, and suppress statements. The trial court also denied defendant's motion to suppress evidence based on the consent forms. The trial court found defendant knowingly and voluntarily consented to having his apartment and car searched.

At trial, Dr. Mitra Kalelkar, who performed the autopsy, testified that Jaynette's body was wrapped in two plastic bags tied over her head and taped; a white plastic bag was taped around her neck; her

body was wrapped in wire mesh and weighted down with a heavy metal object tied to her waist with a piece of blue shirt; and the same blue plaid material was used to bind her ankles. Jaynette was wearing a black blouse with lace around the neck, gray pants, and underclothing.

The body was in an advanced state of decomposition. There were four gunshot wounds to her head. Around the wound behind her right ear were black powder and soot deposits, indicating that it was a contact wound. The other wounds were on top of her head, the left side of her forehead at the hairline, and in front of the left ear on her face. There was one exit wound in the right back of her head, probably from the bullet that entered her left forehead.

The bullet that was thought to be the first one fired was lodged in the skull behind her ear. It did not lacerate the brain and would not have caused instantaneous death. It would have bled only slightly because it was caused by a small caliber bullet and did not strike any major blood vessels.

The other bullets perforated her brain. Two of them were lodged in the brain and one exited the head. Dr. Kalelkar testified that those wounds would probably leak a little blood immediately and then would later bleed more heavily. None of those wounds had powder burns around them. If they were close-range wounds, but not contact wounds, Dr. Kalelkar explained, any powder could have been washed away or filtered by her hair. Dr. Kalelkar stated that she removed a vial of blood from Jaynette's heart. The blood was decomposed and had gone through biological changes. Dr. Kalelkar concluded that the cause of death was multiple gunshot wounds.

It was stipulated that two fired bullets recovered from Jaynette were .25 caliber bullets. There was also a bullet fragment recovered from the body. Jaynette's body was positively identified through her dental X rays.

Kathy Moorman, a forensic serologist formerly employed by the Chicago police department, testified as an expert witness over defendant's objection. She explained how she first performed dry stain tests on the victim's blood and the dry human blood from defendant's black corduroy pants. Moorman identified both the victim's blood and the pant's blood stains as type O.

Moorman conducted electrophoretic tests to compare the enzymes present in both blood samples. She described the process of electrophoresis, which is a method using an electric field to separate and identify blood proteins. Moorman stated that she had performed a few hundred electrophoretic tests. The results indicated that there were

four common proteins present in the two samples. Moorman did not find any different proteins.

On cross-examination, Moorman testified that she tested for 10 enzymes, but only four reacted. If a sample is not suitable or is contaminated, Moorman explained, there will either be a disappearance or a lack of results. When asked whether type O blood is common, she testified that 45% of the white population have type O blood. Tests performed on defendant's car seats, car carpeting, and trunk carpeting showed no traces of blood.

On redirect examination, Moorman stated that only 4% of the population have type O blood with the same four enzymes found in the blood samples. Moorman indicated that those percentages come from an American Society of Blood Banks study that the Chicago police department uses.

Moorman clarified that her job was to compare blood from different sources to determine common characteristics, not to be a statistician, for which she was not qualified. Even so, Moorman testified, she performed a statistical analysis from the population study. Although she knew that the study is used as the standard reference in the field, Moorman admitted that she had never read the study, did not know who prepared the study, whether it had been updated, or whether there are cautionary comments in the study.

Moorman testified that the chart indicated that 79% of the total population have the ESD 1-1 enzyme pattern; 36% have the PGM 2-1, 30% has the GLO enzyme; and 36% have the PEPA 1. Moorman then multiplied the percentages together because that is the method used to combine independent variables. The study, Moorman stated, does not include such a method and she found "it hard to find a correlation between that study and why I multiply the numbers."

Emmett Harmon, an analytical biochemistry expert, testified for defendant. Harmon explained the electrophoresis procedure. Because certain enzymes activated after death have an effect on the blood's protein composition, Harmon stated, a blood sample taken from a body that had been dead for 10 days in 60 degrees Fahrenheit, as Jaynette's body was, could give false results in the protein analysis.

Harmon testified that there are different enzyme tables for different nationalities since enzyme systems are affected by race and national origin. Because the white population is composed of many different nationalities, it is improper to multiply the percentage of the general white population with the four enzymes.

Harmon never received, asked for, or ran tests on the victim's blood or the bloodstains on defendant's pants. He was aware, how-

ever, that the tests performed found both blood samples to be type O. He opined that 60% to 65% of the population would have the four enzymes with type O blood.

Furthermore, Harmon indicated, the sample was probably suspect because the more popular enzymes tested did not react. Therefore, Harmon concluded, it was very dangerous to draw conclusions from Moorman's tests. In addition, Harmon stated, a sample is reliable for testing for only three months. Some of Moorman's tests were conducted six months after Jaynette's death.

When defendant testified at trial, he admitted making a statement, but claimed that it was based on what the police officers wanted to hear. He stated that after Mercurio threatened him about his son's custody, he used the information in the police reports that he had read and pictures he had seen to make up a story. Defendant said that he read and initialed each page of his statement and made corrections because those were the answers the police officers wanted to hear, not because they were accurate. Defendant denied killing Jaynette. He also stated that Jaynette had violent tendencies, having beaten him up at his workplace after he had taken their son to Florida.

After an instruction conference and closing arguments, the jury deliberated and found defendant not guilty of aggravated kidnapping but guilty of voluntary manslaughter and the concealment of a homicidal death.

After the court denied defendant's post-trial motions, a sentencing hearing was held. In aggravation, Officer Tom Paszkowski testified that, on February 14, 1985, he went to defendant's apartment, and found that defendant had a gunshot wound to his left shoulder. Paszkowski recovered a loaded .25 caliber automatic gun, which was confiscated and destroyed.

Corporal William Kreitzer of the Burbank police department testified that he responded to the February 13, 1986, domestic disturbance call. When Kreitzer arrived at that address, Jaynette met him in the hallway. She told him that her husband had struck her on the left side of her face and her back with his fist and threw the telephone at her, striking her in the left arm. Kreitzer noticed redness and swelling on the left side of Jaynette's face, left arm, and back.

Jaynette told Kreitzer that defendant had a history of armed violence. Because defendant had locked her out and was alone in the apartment with their child, Jaynette feared for their child's safety. Kreitzer knocked on the door and announced himself twice. When defendant did not open the door, Kreitzer kicked in the door and ar-

rested defendant. Kreitzer attended the May 2, 1986, court hearing where defendant pleaded guilty to battery and was given supervision.

Three of Jaynette's sisters and her brother read letters to be included in the victim impact statement. All expressed concern for defendant's three-year-old son and denounced defendant's actions. Jaynette's brother also testified about how defendant's killing Jaynette has adversely affected his life. Defense counsel objected to the letters' use in aggravation. The trial court stated that it would consider the letters only as they pertained to the actual impact of the killing on each individual, but not on any collateral matters.

No mitigation was presented and closing arguments were heard. After defendant addressed the court, the trial court stated that it considered the trial testimony, the presentence investigation report, all statutory factors in aggravation and mitigation, the aggravation testimony, the attorneys' arguments and cases cited, and defendant's statement. The trial court specifically found that the crime of concealment of a homicidal death was not committed as part of a single course of conduct, that there was a substantial change in the nature of the criminal conduct, and that justice under the circumstances required a consecutive sentence. Defendant was then sentenced to consecutive terms of 15 years' imprisonment for the voluntary manslaughter and five years' imprisonment for the concealment of a homicidal death.

On appeal, defendant asserts that the trial court erred when it allowed the State to introduce the results from the electrophoretic blood tests on the dried bloodstains and on the victim's blood because the State failed to establish that such testing is reliable and generally accepted in the scientific community. Defendant's argument is without merit and outdated.

To support his arguments, defendant relies on *People v. Harbold* (1984), 124 Ill. App. 3d 363, and various articles, most of which are at least 10 years old. All of defendant's authority discusses dried blood samples, not blood taken from a corpse. Defendant also cites a Michigan case, *People v. Young* (1986), 425 Mich. 470, 391 N.W.2d 270. Of the decisions analyzed by the Illinois Supreme Court in *People v. Eyler* (1989), 133 Ill. 2d 173, courts from 10 jurisdictions have held the testimony on dried blood samples to be admissible. Only one jurisdiction, Michigan, has held to the contrary. *Eyler*, 133 Ill. 2d at 215.

The electrophoresis process is a method used to differentiate among different molecular forms of isoenzymes. Electric current is applied to a blood sample, causing the different enzymes present to separate into their protein components, allowing identification of the

enzymes and their protein components. (*People v. Partee* (1987), 157 Ill. App. 3d 231, 260-61.) The Illinois Supreme Court has ruled that expert testimony on electrophoretic testing of dried bloodstains is admissible. (*Eyler*, 133 Ill. 2d at 214.) The trial court can take judicial notice of the fact that forensic scientists, which is the relevant scientific community, have determined that the process is reliable. *People v. Thomas* (1990), 137 Ill. 2d 500, 518.

The supreme court cited the exhaustive California Appellate Court opinion on this issue, *People v. Reilly* (1987), 196 Cal. App. 3d 1127, 1148, 242 Cal. Rptr. 496, 509, which observed that Dr. Grunbaum, on whose writings defendant in this case relies, "stands virtually alone in his opposition to electrophoretic typing of dried bloodstain evidence." *Eyler*, 133 Ill. 2d at 215.

■ Since the trial court can take judicial notice that electrophoresis is generally accepted by forensic scientists as a reliable method of detecting genetic markers in dried blood, the trial court did not err in allowing Ms. Moorman's testimony about her electrophoretic tests on the victim's blood and the dried blood from defendant's pants.

A defendant's challenge to the process is properly held in front of the jury by cross-examination of prosecution witnesses and presentation of defendant's own witnesses. (*Thomas*, 137 Ill. 2d at 518.) In this case, defendant cross-examined Moorman and presented his own expert witness, who testified about electrophoretic testing.

Defendant then argues that the trial court erred in admitting Moorman's testimony on the statistical evidence derived from the electrophoresis tests because she is not a statistical expert. Moorman testified that 4% of the white population would have type O blood with the four enzymes found in the tests.

The court found that Moorman's testimony on the statistics was proper since it was based on an American Blood Bank report that is relied on by the Chicago police department. Furthermore, the court stated, Moorman testified that she had studied statistics as part of her training. Experts may premise their testimony on information and opinions obtained from the reading of standard publications on which their opinions are based. (*People v. Bradney* (1988), 170 Ill. App. 3d 839, 862.) An expert does not have to name the publication on which she relied if the general consensus of the medical and forensic science community recognizes the study. (*Bradney*, 170 Ill. App. 3d at 862.) The American Blood Bank's study on blood characteristic frequency statistics for the general United States population is generally recognized by medical and forensic science professions. *Bradney*, 170 Ill. App. 3d at 862.

■ Because statistical interpretation of electrophoretic test results are very complex, great caution should be used in interpreting their meaning. Unclear statements of the probability values have a significant potential for being misunderstood. There were major problems with Moorman's testimony about statistics. She admitted not being an expert in statistics and clearly did not understand the method about which she was testifying.

Even though Moorman's credentials as a statistics expert were questionable, defendant opened the door on cross-examination when he questioned Moorman about the frequency of type O blood in the general population. There had been no mention of percentages or frequency in the State's direct examination. During the redirect examination, the State laid a proper foundation to inquire into the frequency of the four enzymes and type O blood in the population.

Where a defendant opens the door to an issue, he interjects the issue into his case (*People v. Wilson* (1990), 196 Ill. App. 3d 997, 1016) and cannot then contend that bringing it to the jury's attention was an error. (*People v. George* (1971), 49 Ill. 2d 372, 379.) If a defendant procures, invites, or acquiesces in the admission of improper evidence, he cannot claim that its admission is error. (*People v. Payne* (1983), 98 Ill. 2d 45, 50.) For those reasons, there was no error in allowing Moorman's testimony on statistics. Moreover, defendant presented his own expert testimony on the statistics.

Defendant then contends that his consecutive sentence was improper because the trial court made no specific findings to support its imposition and the record does not support the sentence. We disagree.

Consecutive sentences may be imposed for offenses not committed as part of a single course of action if the nature and circumstances of the offense and the history and character of the defendant indicate that a consecutive term is required to protect the public from further criminal conduct of the defendant. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4.) While a court's statement of the basis for the required finding is considered directory rather than mandatory, it is required that the record contain facts which support such a finding. *People v. O'Neal* (1988), 125 Ill. 2d 291, 299; *People v. Hicks* (1984), 101 Ill. 2d 366, 374; *People v. Pittman* (1982), 93 Ill. 2d 169, 178.

■ The record supports the consecutive sentence and the trial court clearly stated the factors it considered, including the presentence investigation report, all statutory factors in aggravation and mitigation, the aggravation testimony, the attorneys' arguments and cases cited, and defendant's statement. The trial court specifically found that the crime of concealment of a homicidal death was not

committed as part of a single course of conduct, that there was a substantial change in the nature of the criminal conduct, and that justice under the circumstances required a consecutive sentence.

Defendant asserts that his good background is a mitigating factor indicating that there is no need to protect society from him. Defendant states that he is hardworking, capable of supporting a family, and constantly trying to improve his life. Noting his educational and work histories and prior psychiatric treatment, defendant claims that he can be rehabilitated.

Defendant also cites his lack of a criminal record and his serious emotional and mental problems as mitigating factors. Although he was not seeing a psychiatrist for the month before the killing, defendant testified that he had previously seen one twice a week. Moreover, defendant claims, his suicide attempt was evidence of his mental state.

The State counters that defendant's history and character indicate that a consecutive sentence is appropriate. Although defendant has no previous criminal convictions, the State argues that he has a history of violence. Because defendant reacts to situations with violence, the State concludes, his access to handguns, prior violent behavior, and lack of regard for human life are a danger to society.

Defendant then contends that the nature and circumstances of the offense do not support a consecutive sentence. Defendant explains that the killing occurred in the midst of a stormy relationship after the victim provoked him by going out with another man, taunting him about his failed suicide attempt, and calling him names. Furthermore, defendant states, he was acquitted of murder, indicating that the jury believed that there was some mitigation.

The State replies that the nature and circumstances of the offense support the consecutive sentence because defendant's actions on May 22, 1986, were calculated and planned. Furthermore, the concealment was a separate and distinct act. Defendant left the victim's body in his car trunk all day before driving around to dispose of it. He took 18 hours to ponder how to dispose of the body.

Finally, defendant's claim that the trial judge may have been overly influenced by the 38 letters sent to the court by the victim's family, friends, and co-workers has no merit. The trial judge stated that he did not read the letters, but instead instructed the court clerk to put them into the court file.

While consecutive sentences should be imposed sparingly (*O'Neal*, 125 Ill. 2d at 298), they are within the sound discretion of the trial court, as long as the decision does not conflict with statutory regula-

tions concerning the imposition of such sentences. (*People v. Tigner* (1990), 194 Ill. App. 3d 600, 610.) The trial court is ordinarily best situated to tailor a sentence to the needs of the case by balancing the appropriate factors in imposing the sentence. (*Hicks*, 101 Ill. 2d at 375.) When consecutive sentences are imposed pursuant to the law and are supported by the record, they will not be reversed on review. (*People v. Holland* (1987), 121 Ill. 2d 136, 162; *People v. Steppan* (1985), 105 Ill. 2d 310, 323.) Because the trial court considered all the relevant factors and the record supports its finding, the trial court did not abuse its discretion.

Next, defendant asserts that the trial court erred by refusing his involuntary manslaughter instruction since there was some evidence presented that defendant's conduct was reckless. Defendant contends that his statement that the gun went off when Jaynette moved was sufficient for an involuntary manslaughter instruction.

For an involuntary manslaughter instruction to be given, there must be some evidence at trial, if believed by the jury, that would reduce the crime of murder to involuntary manslaughter. (*People v. Jones* (1987), 157 Ill. App. 3d 106, 112.) An involuntary manslaughter instruction is not warranted if the nature of the killing, shown either by multiple wounds or the victim's defenselessness, reveals the inapplicability of the theory. *People v. Trotter* (1988), 178 Ill. App. 3d 292, 298.

■ If only one shot had been fired, defendant may have had a valid argument. His own statement, however, was that after the first bullet entered behind Jaynette's ear, she was still alive. Defendant then intentionally fired three more shots because he thought that she wanted him to kill her to alleviate her pain. Because of that evidence, the trial court did not err in refusing defendant's involuntary manslaughter instruction.

■ Defendant then asserts that the State improperly used other crimes evidence to show defendant's propensity for violence. Before trial, defendant filed a motion *in limine* to preclude the State from using his February 1986 battery charge. After the State argued that it planned to use that evidence to show motive, the trial court denied defendant's motion. Defendant claims that it was not relevant as a motive. Given the context of the marital discord that existed, defendant argues, the battery charge was insignificant compared to the stormy relationship. Even if the evidence was relevant, its probative value was far outweighed by its prejudicial effect, defendant contends. We disagree. The trial court properly allowed the evidence to show motive.

Generally, evidence of other crimes is inadmissible if relevant merely to establish the defendant's propensity to commit crime. (*People v. McKibbins* (1983), 96 Ill. 2d 176, 182.) If that evidence is relevant to show motive, however, it is admissible. (*McKibbins*, 96 Ill. 2d at 182.) It is within the sound discretion of the trial court to determine whether the probative value of such evidence outweighs its prejudicial impact. *People v. Brown* (1991), 214 Ill. App. 3d 836, 844-45.

Even if admissible, defendant argues, the State used the evidence improperly in its closing argument to argue that defendant had the propensity to be violent. The defendant waived that issue because he did not object at trial or include it in his post-trial motion.

Defendant also asserts that there was no probable cause to arrest him on June 3, 1986, and that his subsequent statements and physical evidence from his apartment should have been suppressed as fruits of the illegal arrest.

Probable cause for arrest exists when facts and circumstances within the arresting officer's knowledge are sufficient to warrant a man of reasonable caution in believing that an offense has been committed and that the person arrested has committed the offense. (*People v. Creach* (1980), 79 Ill. 2d 96, 101.) Although mere suspicion that the person arrested has committed the offense is an insufficient basis for arrest, evidence sufficient to convict is not required. (*People v. Reynolds* (1983), 94 Ill. 2d 160, 166.) Whether or not probable cause for an arrest exists depends on the totality of the facts and circumstances known to the officers when the arrest was made. (*Creach*, 79 Ill. 2d at 102.) A trial court's denial of a motion to suppress statements will not be reversed on review unless it is manifestly erroneous. *People v. Evans* (1988), 125 Ill. 2d 50, 78.

Defendant claims that there were not enough underlying facts to find probable cause. Although the evidence the police had was enough to raise their suspicions, defendant argues, it was not probable cause to justify his arrest. We disagree. The police had enough information to arrest defendant. Therefore, the trial court did not err when it found probable cause to arrest defendant and denied defendant's motions to suppress statements and evidence.

On May 22, 1986, a missing person's report was filed. Two days later, the victim's abandoned car was found in a parking lot. On May 31, 1986, defendant voluntarily went to the police station where he told the police about his marital problems, his separation from his wife, that he last saw his wife on May 2, 1986, in court, when he pleaded guilty to a battery charge, that he owned two .25 caliber handguns, that he had intentionally shot himself with one of the guns,

that he had given an unnamed cousin the other handgun, that he had previously taken his son to Florida against his wife's will, and that he worked in an auto parts business. At that time, he gave the police permission to search his car and his apartment. In his apartment, the police noticed brown plastic garbage bags with black linings containing Jaynette's belongings.

The next day, a body was found in the river. The top of the body was wrapped in brown plastic garbage bags; an automobile cylinder head was attached to the body; and blue automotive towels were found at the scene. On June 2, 1986, at the morgue, the police observed that the brown plastic garbage bags around the victim's torso had black linings and that the victim was wearing a black blouse with dots and grey slacks. When the police examined Jaynette's car, they found automotive towels in the car.

On June 3, 1986, after the police detectives shared this information, defendant went voluntarily to the police station. He was placed unhandcuffed in an interview room. After being given his *Miranda* warnings and seeing the pictures of the victim, defendant confessed to killing his wife. Over the next 12 hours, he made numerous oral statements and a court-reported statement admitting his guilt.

Taken as a whole, the information the police had was sufficient to find probable cause to arrest defendant. Therefore, the trial court properly denied defendant's motion to suppress statements and evidence.

■ Finally, defendant argues that there was insufficient evidence to convict him without his illegally obtained statement. As discussed above, defendant's statement was properly admitted following a lawful arrest. Therefore, defendant's argument is meritless. There was sufficient evidence to convict defendant.

Based on the foregoing, we affirm defendant's convictions and sentence.

Affirmed.

GREIMAN, P.J., and RIZZI, J., concur.