THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. LARRY STRICKLAND, Defendant-Appellant.

First District (3rd Division)   No. 1—90—1531

Opinion filed September 29, 1993.

Rita A. Fry, Public Defender, of Chicago (Z. Peter Tokatlian, Assistant Public Defender, of counsel), for appellant.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb and Marie Quinlivan Czech, Assistant State's Attorneys, of counsel), for the People.

JUSTICE CERDA delivered the opinion of the court:

Following a bench trial, defendant, Larry Strickland, was convicted of murder based on accountability (Ill. Rev. Stat. 1985, ch. 38, pars. 5—2(c), 9—1), two counts of attempted murder (Ill. Rev. Stat. 1985, ch. 38, pars. 8—4, 9—1), two counts of armed robbery (Ill. Rev. Stat. 1985, ch. 38, par. 18—2), and three counts of aggravated kidnapping (Ill. Rev. Stat. 1985, ch. 38, par. 10—2). The convictions resulted from a series of offenses committed by defendant and his brother, Tyrone Strickland, on November 5, 1985. In a separate trial, Tyrone was convicted of the same offenses charged here and received the

death penalty. Defendant was sentenced to life imprisonment for murder and received consecutive and concurrent sentences totalling 150 years' imprisonment for the remaining convictions.

On appeal, defendant asserts that (1) his murder conviction should be reversed because he was not accountable for his brother's actions; (2) he is not guilty of the armed robberies of Officer Dawson and Donald Hamburg; (3) the two attempted murder convictions should be reversed because there was no specific intent to kill; and (4) the trial court erred in imposing consecutive sentences. We affirm in part, reverse in part, and vacate in part.

On the evening of November 5, 1985, defendant and his brother, Tyrone, drove to Cedar Run Complex in Wheeling to find defendant's friend, Everett "CC" Spears. The Stricklands arrived around 7:30 p.m., parked defendant's 1974 Ford Torino, and began looking for CC. After speaking with various neighbors, one of whom called the police, the Stricklands encountered Officer William Dawson.

Karen Dalton, a nurse, testified that she witnessed the incident between Officer Dawson and the Stricklands. She saw the officer walking with two African-American men having a calm conversation. Suddenly, Dalton stated, the officer grabbed defendant by the arm and Tyrone ran between two buildings. Dalton could no longer see Tyrone.

As Dalton watched the officer and defendant go toward a driveway, defendant pulled his arm away, but the officer grabbed it again. At that point, the verbal exchange became animated and a struggle ensued. Then, Dalton heard a gunshot.

After seeing the officer fall, Dalton observed defendant stand over him, punch and kick him, then stand up, walk a couple of feet, and begin to yell. As Dalton drove away, she heard several shots being fired.

Wheeling police officer William Stutzman testified that he was sent as a backup for Officer Dawson. As Officer Stutzman approached the area, he saw a blue car without headlights speeding toward him. The officer stopped his car at an angle in an attempt to block the Stricklands' escape, but they swerved around him.

Officer Stutzman testified that Tyrone, who was sitting in the front passenger seat, fired several shots at him through the windshield of defendant's car. After diving for cover, Officer Stutzman got up and fired six shots at the car as it sped away.

Officer Karl Humbert, an evidence technician, testified that there were two incoming bullet holes and four outgoing bullet holes in the

windshield of defendant's car. In addition, there were two incoming bullet holes in the driver's side door.

As soon as the Stricklands drove away, Officer Stutzman ran to Officer Dawson's squad car, which was parked at 687 Cleo Court. Officer Dawson was lying on his back in the driveway. His face was scratched and scraped, the bridge of his nose and both eyes were puffy, and his glasses were "cockeyed" on his face. Officer Dawson's face had not been injured when Officer Stutzman saw him an hour earlier. Officer Dawson's service revolver was missing and his magazine pouch was empty.

Donald Hamburg testified that he was parked outside his sister's house in Buffalo Grove around 7:30 p.m. when the Stricklands ran toward him. According to Hamburg, defendant pulled a gun from his waistband, pointed it directly at Hamburg, and demanded his wallet and credit cards. Defendant then ordered Hamburg, his grandson, Daniel Johnson, age nine, and his nephew, David Du Vall, age 15, into the car. Defendant told Hamburg to drive them out of the area. There is no evidence that Hamburg gave his credit cards and wallet to defendants.

During the car ride, defendant threatened Hamburg and the two boys if Hamburg did not cooperate. In addition, defendant boasted to Tyrone, "[D]id you see what I did to him?" and asked Tyrone if he had any ammunition left.

Ultimately, Hamburg drove his car to downtown Chicago. At Congress Avenue and State Street, he curbed his car next to a squad car, jumped out, and alerted Chicago police officer Edward Gross. Everyone got out of Hamburg's car. As defendant ran away, Hamburg saw him turn and shoot at Officer Gross.

Officer Gross testified that he was stopped at a traffic light at Congress Avenue and State Street in Chicago when Hamburg's car pulled in front of his squad car. Officer Gross saw both Stricklands get out of the car and run south on State Street. When Tyrone was about 20 feet away, he turned around and fired once at Officer Gross. Then, defendant fired four or five shots at him. Officer Gross dove for cover and radioed for help.

A short time later, defendant was arrested as he hid under an automobile in a parking lot at 619 South Plymouth Court. He was carrying a .38-caliber revolver with one live and five spent rounds. A ballistics expert later identified the gun as the weapon that fired the fatal bullet into Officer Dawson. Tyrone was arrested shortly afterward with Officer Dawson's service revolver in his possession.

It was stipulated that Dr. Robert Stein, the Cook County medical examiner, would have testified that he determined that Officer Dawson died from a gunshot wound to the left chest wall.

After the State rested, defendant testified in his own behalf. He stated that during the evening of November 5, 1985, he and his brother went to Wheeling to visit his friend, CC, who lived at Cedar Run Complex. That night, defendant was carrying a loaded .38-caliber revolver under the dashboard of his car. When he arrived at the complex, defendant parked his car and began looking for CC's house. After unsuccessfully trying to locate CC, defendant began walking back to his car.

When defendant saw a squad car approach, he took his gun and threw it away. Moments later, the police officer got out of his car, approached the Stricklands, and told them to lean against a fence. As Officer Dawson searched them, he asked about their purpose for being in the area. Defendant explained that he was looking for CC's house, and Tyrone said he had nothing to do with it. As Officer Dawson continued to question defendant about alleged drug activity, Tyrone walked away.

According to defendant, he agreed to have his car searched but did not want to be present because he was wary of the officer's intentions. Instead, defendant started to walk toward the houses. At that point, Officer Dawson put his hand on defendant and pulled him in the car's direction.

At the car, Officer Dawson started to fall and defendant tried to hold onto him, but Officer Dawson pulled defendant over the car. During the struggle, Officer Dawson radioed for help. According to defendant, both men fell and defendant landed on top of the officer. When defendant got up and saw Dawson's arm go down to his side, he kicked the officer's arm back and placed his foot on it.

Defendant turned around to see Tyrone, who had defendant's gun in his waistband. Defendant testified that he tried to pull Tyrone away from Officer Dawson, but when Tyrone started to take out the gun, defendant went to his car, got in, and started the engine. Even though defendant was in his car a few feet away from Tyrone when he shot Officer Dawson, defendant claimed that he did not hear the gunshot and did not know until later that Officer Dawson had been shot or killed.

Defendant testified that he noticed that Tyrone had Officer Dawson's service revolver as they were driving away. Defendant said that he stopped the car and told Tyrone to return the gun, but Tyrone refused. At that point, a police car was coming toward them.

According to defendant, he raised his hands in the air and advised Tyrone to do nothing when Officer Stutzman approached their car. Officer Stutzman, however, opened fire on them from 30 feet away. Defendant testified that Officer Stutzman fired 14 or more shots into the car. One of the bullets hit defendant in the finger. Using defendant's revolver, Tyrone fired three shots through the windshield.

During the shooting, defendant drove away. He stopped in a parking lot in nearby Buffalo Grove where Tyrone told him that he had shot and killed Officer Dawson. Tyrone returned defendant's gun, but kept Officer Dawson's revolver.

Defendant stated that he and Tyrone abandoned the car and began running. A few blocks away, Donald Hamburg was standing next to a car. Two boys were nearby. Defendant admitted that he had his gun in his hand, but claimed that he was trying to give it to Hamburg.

Defendant testified that Hamburg agreed to let him use the car, but Tyrone approached and told everyone to get in. Defendant stated that he put his gun on the floor and asked Hamburg to drive him to Chicago to a hospital. Defendant denied that he ever threatened Hamburg, heard Tyrone threaten anyone, or saw Tyrone with a gun.

Ultimately, Hamburg drove to the Chicago Loop, where he jumped out of his car and alerted a Chicago police officer. When Tyrone got out of the car and ran, Officer Gross fired three times at him. Defendant denied seeing Tyrone return fire.

According to defendant, he got out of the car and stood with his hands raised. When he realized that Officer Gross was going to shoot him, he ran. He turned around and shot three warning shots to keep Officer Gross from killing him. As he went around the corner, he saw Tyrone with a gun in his hand. Defendant hid under a car, where he was arrested a short time later, and Tyrone continued to run.

Tyrone was called by the defense to testify. When he invoked his fifth amendment rights against self-incrimination, the trial court admitted the transcript of Tyrone's testimony during his own trial. At that trial, Tyrone had testified that he and defendant drove to Wheeling to visit CC, whom Tyrone did not know.

When they arrived at the Cedar Run Complex, defendant pointed to a building where he thought CC lived. They walked up to an apartment and knocked on a sliding glass door. A white woman opened the door a crack. When defendant asked if CC lived there, she said no and closed the door. As they walked away, Tyrone told defendant, "Let's get out of here!" Defendant, however, convinced Tyrone to continue looking for CC.

As the Stricklands walked up to another building, they saw another white woman driving into a garage on the next street. Defendant went over to the garage, but the woman slammed the door down. According to Tyrone, he was then "scared to death" and told defendant that he wanted to go.

As the Stricklands were going to their car, a white man ran up and asked if they had harassed his wife. Tyrone testified that he kept walking, but defendant stopped to talk to the man. After the conversation ended, Tyrone saw a police car parked near a dumpster. Defendant walked toward the police car and moved his arm as if he had thrown something. Tyrone followed defendant to the police car.

Tyrone testified that Officer Dawson got out and told the Stricklands to stand against the dumpster. After searching them, Officer Dawson asked defendant if he had thrown a key and where were the drugs. Tyrone backed away with his hands in the air and said, "I don't want to be no part of this here. I got to go." At that point, Tyrone did not have a weapon.

The officer then grabbed defendant's arm, but stated that he was not going to arrest him. Officer Dawson called for assistance on his radio. Tyrone stated that he was "terrified" and unsure of what was happening because the officer spoke as if he knew defendant. Seeing a man standing in a nearby grassy area, Tyrone walked up to him, hoping to get help.

At that point, Tyrone decided to find whatever defendant had thrown away so that the officer would leave them alone. As he looked in the grass, Tyrone kicked an object and picked it up. Tyrone claimed that he did not know what it was until he ran toward the officer. When he realized it was a gun, Tyrone said that he still intended to give it to the officer. At that point, Tyrone could not see either defendant or Officer Dawson.

When Tyrone approached the officer and defendant, Officer Dawson had defendant in a chokehold against a car. Tyrone yelled, "No, wait!" and the officer turned as if to pull his gun from his holster. As the officer turned, his arm struck Tyrone's arm and the gun went off. Tyrone claimed that he did not know how the gun went off and did not recall how he had been holding it. After the gun fired, the officer fell.

Tyrone testified that he was scared and shaking. He reached down and took the officer's gun, although he said he did not know why. The Stricklands got into the car and defendant drove away.

When a car came at them and stopped in a slanted manner, defendant stopped the car. Even though defendant put his hands up

in the air, bullets came flying through the windshield. One bullet struck defendant in the hand, and Tyrone was cut on the chin by flying glass. Tyrone testified that he picked up a gun from the front seat and fired three times through the window in order to scare the shooter.

As defendant drove away, he rammed the other car. After driving awhile, defendant stopped the car in a parking lot. At that time, Tyrone returned defendant's gun, but kept Officer Dawson's revolver.

The Stricklands abandoned the car and ran several blocks where they saw an elderly man and two kids. Tyrone testified that they told the man to drive them out of the area. Eventually, they reached downtown Chicago, where the man stopped near a police car and jumped out. Tyrone also jumped out and ran down State Street into an alley, where he was arrested. Tyrone denied firing the gun on State Street.

At the close of all the evidence, the trial court found defendant guilty of Officer Dawson's murder based on accountability, the attempted murders of Officers Stutzman and Gross, the armed robbery of Officer Dawson based on Tyrone taking his service revolver, the armed robbery of Hamburg based on taking his car, and the aggravated kidnapping and kidnapping of Hamburg, Johnson, and Du Vall. The trial court found that defendant set the matter in motion when the scuffle occurred. As a result of that struggle, Tyrone came to his brother's aid and shot Officer Dawson.

Defendant was then found eligible for the death penalty. In aggravation, the State presented evidence that defendant had a prior murder conviction in 1975, and an unlawful use of weapons conviction in 1982.

Defendant was sentenced to life imprisonment without parole for Officer Dawson's murder and 30 years' concurrent imprisonment for the armed robbery of Officer Dawson. He also received two consecutive sentences of 30 years' imprisonment for the attempted murders of Officers Stutzman and Gross, a consecutive sentence of 15 years' imprisonment for the aggravated kidnapping of Hamburg, Johnson, and Du Vall, and a concurrent sentence of 30 years' imprisonment for the armed robbery of Hamburg.

On appeal, defendant asserts that he was not accountable for the murder of Officer Dawson, whom his brother, Tyrone, shot and killed. Defendant argues that he did not in any way aid or abet Tyrone in the commission of the offense and had no intention to shoot Officer Dawson or to have him shot.

The State responds that defendant is accountable for Tyrone's actions because he initiated the criminal enterprise that resulted in Officer Dawson's death. The State maintains that the criminal enterprise was the unlawful use of a weapon by a felon and the felony battery on a police officer. We find that defendant is accountable for Tyrone's actions.

■ For a conviction on the accountability theory, the State must establish beyond a reasonable doubt that: (1) the defendant solicited, ordered, abetted, agreed, or attempted to aid another in the planning or commission of the crime; (2) the defendant's participation took place before or during the commission of the crime; and (3) the defendant had the concurrent intent to promote or facilitate the commission of the crime. *People v. J.H.* (1990), 136 Ill. 2d 1, 17, 554 N.E.2d 961; *People v. Carrizales* (1992), 240 Ill. App. 3d 893, 900, 608 N.E.2d 30; Ill. Rev. Stat. 1987, ch. 38, par. 5—2.

■ To prove the intent to promote or facilitate a crime, the State must establish beyond a reasonable doubt that the defendant shared the criminal intent of the principal or was engaged in a common design. (*People v. Stanciel* (1992), 153 Ill. 2d 218, 234-35, 606 N.E.2d 1201.) Proof of a common purpose can be inferred from the circumstances surrounding the commission of the act. (*J.H.*, 136 Ill. 2d at 17.) Even though the person does not have to actively participate in the overt act (*People v. Evans* (1981), 87 Ill. 2d 77, 83, 429 N.E.2d 520), mere presence at the scene, even with knowledge that the crime is being committed, is not sufficient to establish accountability for the actions of another. (*People v. MacFarland* (1992), 228 Ill. App. 3d 107, 122, 592 N.E.2d 471.) However, mere presence at the scene in addition to acts after its commission may be enough. *MacFarland*, 228 Ill. App. 3d at 122.

■ We affirm defendant's conviction for Officer Dawson's murder based on accountability. Defendant was not merely present at the scene of the shooting, but was a main actor in the midst of committing violence on a police officer. Not only did defendant kick Officer Dawson's arm before the shooting, but he also kicked and punched the officer immediately after the shooting. Thus, Tyrone shot Officer Dawson in furtherance of defendant's aggravated battery.

The acts of defendant in driving his car away from the scene of the crime with the assailant, the shooting episode with Officer Stutzman, and the kidnapping of Hamburg are the circumstances surrounding the commission of the shooting of Officer Dawson. These acts prove the common purpose involved in the homicide and make defendant accountable for the murder.

■ Next, defendant asserts that he is not guilty of the armed robbery of Officer Dawson because the evidence does not establish that Tyrone shot and killed Dawson for the purpose of taking property from him. Tyrone used the same argument in his own appeal to the Illinois Supreme Court.

The court affirmed Tyrone's conviction for the armed robbery of Officer Dawson, finding that Tyrone's use of force was concurrent with his taking Officer Dawson's property. (*People v. Strickland* (1992), 154 Ill. 2d 489, 524, 609 N.E.2d 1366.) The court stated that an intent to take Officer Dawson's weapon did not have to be previously formulated. (*Strickland*, 154 Ill. 2d at 525.) Although the force used must be concurrent with the taking of the property, it is not necessary to show that the force exerted against the victim was for the purpose of depriving him of the property taken. (*Strickland*, 154 Ill. 2d at 525.) In accordance, we affirm defendant's conviction for the armed robbery of Officer Dawson.

■ Next, defendant contends that he is not guilty of armed robbery against Donald Hamburg because neither he nor Tyrone took the car from Hamburg, who remained in operation of the car throughout the time they were present. The State responds that defendant and Tyrone effectively controlled the use of Hamburg's car, thus putting defendant and Tyrone in constructive possession of Hamburg's car.

In Tyrone's appeal to the Illinois Supreme Court, the court rejected the same argument. The court stated:

" '[T]he taking by force or the threat of force is the gist of the offense [of robbery]' [citation], and the offense 'is complete when force or threat of force causes the victim to part with possession or custody of property against his will.' [Citation.]" *Strickland*, 154 Ill. 2d at 525-26.

The court found that the evidence was not sufficient to satisfy the taking element of armed robbery because there was no evidence that Hamburg's car was ever taken from him. (*Strickland*, 154 Ill. 2d at 526.) Even though the Stricklands' actions denied Hamburg a large measure of control over the car and would have been sufficient to sustain a charge of intimidation, the court reversed the conviction because the car was never removed from Hamburg's actual possession. (*Strickland*, 154 Ill. 2d at 526.) In accordance, we reverse defendant's conviction for the armed robbery of Hamburg.

■ Next, defendant asserts that he is not guilty of the attempted murders of Officers Stutzman and Gross because the State did not prove that he had the intent to kill. We disagree.

Taking the evidence in the light most favorable to the prosecution, we affirm defendant's attempted murder convictions. The intent to kill, which is required for a conviction of attempted murder (*People v. Jones* (1979), 81 Ill. 2d 1, 9, 405 N.E.2d 343; *People v. Bland* (1992), 228 Ill. App. 3d 1080, 1086, 593 N.E.2d 639), is a state of mind that can be proved by the surrounding circumstances, including the character of the assault and the use of a deadly weapon. (*People v. Mitchell* (1991), 209 Ill. App. 3d 562, 569, 568 N.E.2d 292.) Firing a gun at a person supports the conclusion that the person doing so acted with an intent to kill. *Mitchell*, 209 Ill. App. 3d at 569.

■ Next, defendant asserts that the imposition of consecutive sentences was error because there was no substantial change in the nature of the criminal objective. Defendant maintains that the taking of Officer Dawson's gun, the shooting at Officer Stutzman, the ride in Hamburg's car, and the shooting at Officer Gross had only one aim, which was to elude apprehension by the police.

Consecutive sentences may not be imposed for offenses committed as part of a single course of conduct during which there was no substantial change in the nature of the criminal objective. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—4(a).) Although consecutive sentences should be imposed sparingly (*People v. O'Neal* (1988), 125 Ill. 2d 291, 298, 531 N.E.2d 366; *People v. Lopez* (1992), 228 Ill. App. 3d 1061, 1076, 593 N.E.2d 647), they are within the sound discretion of the trial court as long as the decision does not conflict with the statutory regulations concerning the imposition of such sentences. *Lopez*, 228 Ill. App. 3d at 1076-77.

We find no error in the trial court's imposition of consecutive sentences. In Tyrone's appeal to the Illinois Supreme Court, the court found that the trial court did not err in imposing consecutive sentences for Tyrone's nonmurder felony convictions. (*Strickland*, 154 Ill. 2d at 540.) The court found that the murder of Officer Dawson, the attempted murder of Officer Stutzman, the aggravated kidnapping, and the attempted murder of Officer Gross were separate offenses where a substantial shift in the nature of the criminal objective occurred with each offense. (*Strickland*, 154 Ill. 2d at 541.) In accordance, we conclude that defendant's offenses were committed serially with substantial breaks in time and changes in purpose. Thus, we affirm defendant's consecutive sentences.

■ Finally, in defendant's *pro se* brief, he asserts that he received ineffective assistance of counsel. His allegations are without merit.

Based on the foregoing, we affirm in part, reverse in part, and vacate in part. We affirm defendant's convictions for the murder and armed robbery of Officer Dawson based on the theory of accountability, the attempted murders of Officers Stutzman and Gross, and the aggravated kidnapping of Hamburg, Johnson, and Du Vall.

Further, we reverse defendant's conviction for the armed robbery of Hamburg and vacate the 30-year concurrent sentence imposed for that offense.

We affirm all other sentences imposed by the trial court.

Affirmed in part; reversed in part and vacated in part.

RIZZI and GREIMAN, JJ., concur.