**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2021 IL App (3d) 180489-U

Order filed January 27, 2021

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2021

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-18-0489 Circuit No. 17-CF-504 |
| | ) | |
| DELRICK M. RUTHERFORD, | ) ) | Honorable Kevin W. Lyons, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE WRIGHT delivered the judgment of the court.
Presiding Justice McDade and Justice O'Brien concurred in the judgment.

_____

**ORDER**

¶ 1     Held:  The State's evidence was sufficient to prove defendant guilty beyond a reasonable doubt of all charges with the exception of the offense of endangering the life or health of a child. Defendant failed to establish plain error regarding the trial court's evidentiary rulings and forfeited his argument regarding the court's usage of the term "forcible felony." The record is insufficient to warrant review of defendant's ineffective assistance of counsel claims.

¶ 2     Following trial, a Peoria County jury found defendant guilty on all seven criminal

charges levied by the State. On appeal, defendant challenges the sufficiency of the State's

evidence and several of the trial court's evidentiary rulings. Additionally, defendant alleges he received ineffective assistance of counsel. We affirm in part and reverse in part.

¶ 3                                    I. BACKGROUND

¶ 4          On June 20, 2017, the State charged defendant by indictment with two counts of attempt first degree murder (counts I and II) (720 ILCS 5/8-4(a) (West 2016)), one count of aggravated battery (count III) (720 ILCS 5/12-3.05(e)(1) (West 2016)), two counts of aggravated discharge of a firearm (counts IV and V) (720 ILCS 5/24-1.2(a)(2) (West 2016)), and one count of unlawful possession of a weapon by a felon (count VI) (720 ILCS 5/24-1.1(a) (West 2016)). On September 12, 2017, the State charged defendant by indictment with one count of endangering the life or health of a child (count VII) (720 ILCS 5/12C-5(a)(1) (West 2016)).[1]

¶ 5          Defendant's jury trial commenced on January 8, 2018. Immediately prior to trial, the court queried the parties as to how they would like to address defendant's prior conviction in

---

[1]Count I, charging attempt murder first degree murder, alleged that on or about June 4, 2017, defendant, with the intent to commit the offense of first degree murder in violation of 720 ILCS 5/9-1(A)(1) (West 2016), performed an act which constituted a substantial step toward the commission of that offense in that defendant knowingly and without lawful justification personally discharged a firearm at Krishna Washington with the intent to kill Krishna Washington. Count II, charging attempt first degree murder, alleged that on or about June 4, 2017, defendant, with the intent to commit the offense of first degree murder in violation of 720 ILCS 5/9-1(A)(1) (West 2016), performed an act which constituted a substantial step toward the commission of that offense in that defendant knowingly and without lawful justification, while armed with a handgun, discharged said gun at Krishna Washington with the intent to kill Krishna Washington. Count III, charging aggravated battery, alleged that on or about June 4, 2017, defendant, in committing a battery, knowingly discharged a handgun in the direction of Krishna Washington, thereby causing injury to Krishna Washington by means of the discharging of said firearm. Counts IV and V, charging aggravated discharge of a firearm, alleged that on or about June 4, 2017, defendant knowingly discharged a firearm in the direction of Krishna Washington and knowingly discharged a firearm in the direction of a motor vehicle defendant knew to be occupied by another. Count VI, charging unlawful possession of a weapon by a felon, alleged that on or about June 4, 2017, defendant knowingly had in his possession a handgun, and defendant had previously been convicted of the forcible felony of involuntary manslaughter in Peoria County case No. 04-CF-731, a case which involved the use of physical force upon another person that resulted in the death of that person. Count VII, charging endangering the life or health of a child, alleged that on or about June 4, 2017, defendant knowingly caused the life or health of Delrick Rutherford Jr., a child under age 18 (D.O.B. May 7, 2010), to be endangered by discharging a firearm into a motor vehicle occupied by said child.

front of the jury as it pertained to count VI. Defense counsel indicated that he did not want the specifics of defendant's prior felony read to the jury. Counsel explained that he would stipulate to defendant having a prior felony conviction. Counsel stated that count VI could be heard with the remainder of the charges, or, that in the alternative, the defense was willing to bifurcate the proceeding to have count VI heard after the other charges were presented. However, counsel indicated that because his client intended to testify, the specific felony charge would invariably be presented during the trial, rendering any bifurcated effort meaningless. The State responded that the stipulation needed to be to a "forcible" felony, "because that raises this to a Class 2 felony rather than a Class 3 unlawful possession of weapon by a felon, so that distinction would need to be made when the instruction — or the jury is being informed." The parties agreed that, when the time came, the jury would simply be informed that defendant had been "previously convicted of a forcible felony."

¶ 6         City of Peoria police officer Ty Piercy testified that on June 4, 2017, at 2:48 a.m., he arrived at 2112 North Underhill Street in Peoria, Illinois, after receiving a "ShotSpotter" alert that four gunshots had been fired near the driveway of that address. Piercy described "ShotSpotter" as a system of sensors that detects and triangulates the position of gunshots throughout the city.

¶ 7         Upon arrival at that location, Piercy observed a blue vehicle, with multiple bullet holes, that appeared to have backed into a fence. Piercy observed a woman in the driver's seat of the vehicle and a male child seated in the back passenger's seat. Piercy did not speak to the vehicle's occupants. During his testimony, Piercy identified and described several photographs he took

while at the scene, marked as People's exhibit Nos. 3-12, which were admitted into evidence.[2] People's exhibit No. 3 depicted a bullet hole/strike to the driver's side window. People's exhibit No. 4 depicted three additional bullet holes/strikes, two to the front windshield and one to the A-pillar on the driver's side of the windshield. People's exhibit No. 5 depicted an exit bullet hole/strike in the rear passenger side window. People's exhibit No. 6 depicts a bullet positioned on the driver's seat of the vehicle. People's exhibit No. 7 depicts a photograph of a cell phone lying in the driveway of the residence.

¶ 8        Krishna Washington testified that in June 2017, she lived with defendant and her young son at 2112 North Underhill Street in Peoria, Illinois.[3] Washington explained that defendant was her boyfriend, "hopefully soon to be husband," and was her son's father. The couple had been together for 15 years. On June 3, 2017, defendant was at Washington's residence between 12 p.m. and 1 p.m. for the purpose of picking up lawn equipment.

¶ 9        According to Washington, sometime around 10 p.m., Washington and her son returned to her residence. Washington explained that early the next morning she was speaking with defendant when their telephone conversation abruptly ended because she had not paid her cell phone bill. After the phone call unexpectedly dropped, Washington and her son left the residence to travel to Walgreens to purchase a debit card. Washington planned to use the debit card to pay her phone bill. When Washington left the residence, she noticed the couple's large grill had been

---

[2]Additional exhibits included People's exhibit No. 9 (a photograph of the vehicle as it was found when Piercy arrived on scene), People's exhibit No. 10 (another photograph of where the vehicle came to rest), People's exhibit No. 11 (a photograph of the same location during daylight hours), People's exhibit No. 12 (a photograph of a large grill or smoker that was in the driveway of the residence). People's exhibit No. 8 was not admitted into evidence at this time.

[3]Washington later stated defendant was not living with her on June 3, 2017.

moved from the backyard to the driveway. Washington assumed defendant moved the grill with his truck. Washington also noticed that a large crowd gathered across the street.

¶ 10    Washington returned to her residence at approximately 2:48 a.m. At that time, her son was in a booster seat located in the back seat on the passenger side of her blue Mazda. Upon returning to her residence, Washington noticed that the crowd remained gathered across the street.

¶ 11    While sitting inside of her vehicle, in her driveway, Washington saw defendant drive down the street in his black Chevrolet truck. Washington did not exit her vehicle and dialed 911 because she anticipated the couple would have a disagreement about the grill. Washington testified that at that time she felt "betrayed and angry." Defendant exited his vehicle, stood in the yard of the residence to Washington's left side, and asked for his property. While on the phone with 911, Washington heard three gunshots. Washington screamed, put her car in reverse as fast as she could, and backed through a fence behind her driveway. The pole of the fence was wrapped around her front bumper and prevented her from driving away.

¶ 12    Washington told the 911 dispatcher that "Delrick Rutherford" shot her in the back of the head. After the shots, Washington saw defendant run to his vehicle and leave the scene. Washington explained that a bullet grazed the back of her head and her left shoulder and that shattered glass was embedded in her left shoulder. Her son did not sustain injuries. According to Washington, her vehicle sustained extensive damage.

¶ 13    Washington received treatment for her injuries at the hospital. Defendant did not return to the scene or visit Washington in the hospital.

¶ 14    On cross-examination, Washington testified that defendant was not the shooter. Washington stated that while she was looking to her left at defendant, she saw two shots/muzzle

5

flashes come from near the porch of her home, behind where defendant stood. She did not see an actual person holding a gun. Washington explained that the fence she struck was located directly behind her driveway in her neighbor's yard across the street.

¶ 15        On redirect examination, the State received permission from the court to treat Washington as an adverse witness for purposes of impeachment. At this time, Washington admitted to telling officer Flynn, a first responder at the scene, that defendant approached the driver's side of her vehicle, told Washington "I will kill you," pulled out a black handgun from his waistband, and pointed the gun at Washington with both hands. Washington testified that her statements to Flynn were lies.

¶ 16        Washington admitted to telling two female paramedics at the scene that her ex-boyfriend had shot her, which Washington agreed was also contrary to her trial testimony. Washington admitted to telling a nurse at OSF St. Francis Hospital that her ex-boyfriend shot her. Washington admitted to sending a text message to her sister, Alexis Washington (Alexis) as she waited in her car for first responders to arrive stating:

> "[WASHINGTON]: Just got shot.
>
> ALEXIS: WTH?
>
> [WASHINGTON]: 3xs.
>
> ALEXIS: Where and how.
>
> [WASHINGTON]: Neck, shoulder, Delrick."

¶ 17        When cross-examined about her June 4, 2017, interview with Detective Roberto Vasquez at the Peoria Police Department, Washington claimed she told Vasquez that defendant was not the shooter.

6

¶ 18　　On recross-examination, Washington testified that she told various individuals that defendant shot her "Because me or my son could have lost our life. That's why I blamed [defendant], because it resulted from an argument. Had I not had the argument outside with [defendant] I don't think me or my son would have came [*sic*] near death." Washington explained that she blamed defendant because she felt defendant was the target of the shooting. Washington did not tell Vasquez about seeing another potential shooter because she did not want to be charged with a crime because she made several false reports concerning the identification of the shooter.

¶ 19　　Washington's young son, then seven years old, testified and identified defendant as his father in open court. The child explained that it was "Nighttime" when his father hurt his mother, Washington, while the child was in the back seat and his mother was in the front seat of a car by the garage. The child stated that his father injured his mother with a gun. On cross-examination, the child testified that he did not actually see defendant shoot his mother and did not see an object in defendant's hand.

¶ 20　　City of Peoria Police Detective Craig Johnson testified that he interviewed the child at the Child Advocacy Center on June 5, 2017. Johnson identified People's exhibit No. 2 as the video recording of the interview Johnson conducted with the child. The video recording of the interview was admitted and published to the jury without objection. The child's statements from the recorded interview was consistent with his trial testimony.

¶ 21　　David Tuttle, manager of the City of Peoria Emergency Communication Center (ECC), testified concerning the documentation, storage, and retrieval of previous 911 audio recordings. At this time, the State published People's exhibit No. 1, an audio recording of a 911 call received

by the ECC at approximately 2:40 a.m. on June 4, 2017.[4] The recording documented the 911 call from Washington concerning the incident at 2122 North Underhill Street in Peoria, Illinois.

¶ 22    During the initial moments of the 911 call, Washington told the dispatcher that "Delrick Rutherford" was outside of her vehicle, "acting a fool," and was threatening her. Though the audio is faint and/or muffled, approximately 46 seconds into the call, Washington said defendant told her he was going to "kill me."

¶ 23    During the 911 recording, Washington's voice transitioned from calm to frightened with rapid speech relaying a description of the events as they unfolded. Washington identified defendant as the shooter and spelled his name for the dispatcher. Washington told the dispatcher she had been shot in the head, that there were bullet holes in her car, that defendant had a gun, and that defendant fled the scene. In response to the dispatcher's questions, Washington described defendant's vehicle, route of travel away from the scene, and provided a partial license plate number for defendant's vehicle.

¶ 24    The dispatcher continued to speak to Washington about the location of her son in the car and asked whether Washington could exit the vehicle and take her son into the house for safety purposes. Washington remained on the line with the dispatcher until the first responders arrived.

¶ 25    City of Peoria Police Officer David Buss testified that he processed the blue Mazda vehicle involved in the June 4, 2017, shooting for evidence. Buss identified several exhibits, which were admitted without objection.[5] Based on exhibits previously identified as People's

---

[4]The trial court indicated that People's exhibit No. 1 would be provided to the jury when they retired to the jury room. People's exhibit No. 1 is contained in the record on appeal, despite the State's assertion to the contrary.

[5] The admitted exhibits included People's exhibit No. 15 (a photograph of a bullet on the passenger side floorboard), People's exhibit No. 16 (a photograph of the vehicle showing a bar sticking out of the front bumper and two bullet holes in the front windshield), People's exhibit No. 8 (the black cellular phone found at the scene), and People's exhibit No. 14 (a box containing two bullets, one found on the driver's seat and a second found on the front passenger floorboard).

exhibit Nos. 3-5, Buss observed two bullet strikes to the front windshield, one to the driver's side window, one to the A-pillar of the driver's side door frame, one to the dashboard, and one to the rear passenger's side window.

¶ 26    City of Peoria Police Detective Roberto Vasquez testified that defendant turned himself in to the police and was arrested by Vasquez three days after the shooting. Vasquez testified that he organized the search of a black Chevrolet truck involved in the case. During the search, Vasquez located a bank statement bearing defendant's name. Vasquez further testified that the SKU number associated with the black cellular phone found at the scene of the shooting matched that of the Boost Mobile phone box located in the truck. Vasquez did not locate a gun or ammunition inside of the black truck. Vasquez identified several exhibits, which were admitted without objection.[6]

¶ 27    Vasquez also described the statements Washington made during the June 4, 2017, police interview. Washington told Vasquez during the interview that defendant was the shooter and did not assert another person fired the gunshots. Instead, Washington told Vasquez it was hard for her to believe defendant would hurt her or do something like this.

¶ 28    City of Peoria Police Officer Christina Chavez testified that she was dispatched to the scene of the shooting on the night in question. Upon arrival, Chavez noted that Washington was very calm as she remained seated in her vehicle. Chavez did not testify to the contents of the conversation she had with Washington.

¶ 29    Barbara Bryant, a registered nurse at OSF St. Francis Hospital, testified that she treated Washington in the emergency room following the shooting. Bryant identified People's exhibit

---

[6]These exhibits included People's exhibit No. 17 (a photograph of the black truck), People's exhibit No. 18 (a photograph of a letter found in the truck that was addressed to Delrick M. Rutherford), People's exhibit No. 19 (a photograph of the Boost Mobile phone box located in the truck), People's exhibit No. 20 (the bank statement/letter), and People's exhibit No. 21 (the Boost Mobile phone box).

Nos. 23-25 as photographs of the injuries Washington sustained. People's exhibit Nos. 23-25 were admitted without objection and published to the jury.[7] Bryant testified that Washington's injuries were consistent with a gunshot wound/graze.

¶ 30　　　　Alexis, Washington's sister, testified that she received a text message from Washington and responded to the message in the early morning hours of June 4, 2017. Alexis identified People's exhibit No. 22 as a screenshot of the text message conversation she took. The State admitted and published the screenshot to the jury without objection.[8]

¶ 31　　　　Following the conclusion of Alexis's testimony, the State introduced a certified copy of defendant's "prior forcible felony" conviction in Peoria County case No. 04-CF-739 as referenced in count VI. Defense counsel did not object and acknowledged that defendant had a "prior felony conviction." The trial court then explained to the jury that the certified copy "will not go back to you, but it will be entered into the record as the following: That the defendant, Delrick Rutherford, has on a previous occasion been convicted of a forcible felony in Illinois."

¶ 32　　　　At the close of the State's evidence, the trial court denied defense counsel's motion for a directed verdict. The jury found defendant guilty on all seven counts. On February 6, 2018, defendant filed a motion for judgment of acquittal notwithstanding the verdict or for a new trial, arguing the State failed to prove defendant guilty of the charged offenses beyond a reasonable doubt and that defendant was denied a fair trial due to the trial court's erroneous rulings on

---

[7]The State admitted People's exhibit No. 23 (a photograph of abrasions and glass on Washington's left arm), People's exhibit No. 24 (a photograph of abrasions to Washington's left shoulder and neck area), and People's exhibit No. 25 (a photograph of abrasions on the back of Washington's neck and head).

[8]People's exhibit No. 22 reads substantially the same as Washington's in-court admissions concerning the content of the text messages documented earlier in this order.

several evidentiary matters.[9] The trial court denied defendant's motion and sentenced defendant to a term of 40 years' imprisonment on count I and a concurrent term of 10 years' imprisonment on count VI. Defendant appeals.

¶ 33                                    II. ANALYSIS

¶ 34        Defendant's contentions of error on appeal challenge the sufficiency of the evidence on all charges, several of the trial court's evidentiary rulings, the trial court's reference to defendant's prior forcible felony conviction, and the effectiveness of defense counsel. We address defendant's contentions of error sequentially below.

¶ 35                           A. Sufficiency of the Evidence

¶ 36        Defendant asserts the State's evidence failed to establish his guilt on all charges beyond a reasonable doubt. To review, the jury convicted defendant of two counts of attempt first degree murder (counts I and II), one count of aggravated battery (count III), two counts of aggravated discharge of a firearm (counts IV and V), one count of unlawful possession of a weapon by a felon (count VI), and one count of endangering the life or health of a child (count VII). When faced with a challenge to the sufficiency of the evidence, it is not the function of the reviewing court to retry the defendant. *People v. Jimerson*, 127 Ill. 2d 12, 43 (1989); *People v. Collins*, 106 Ill. 2d 237, 261 (1985). Rather, viewing the evidence in the light most favorable to the prosecution, a reviewing court is tasked with determining whether any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Id.*; *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

_____

    [9]On February 12, 2018, defendant filed an amendment to his motion for judgment of acquittal notwithstanding the verdict or for a new trial, adding several contentions of error, including that the jury should not have been informed that defendant had been convicted of a "forcible felony" and that trial counsel erred by failing to move for a separate trial on the charge of unlawful possession of a weapon by a felon, among other things. On April 4, 2018, defendant filed a supplemental motion for judgment of acquittal or, alternatively, for a new trial after retaining new counsel.

11

¶ 37    It is the responsibility of the trier of fact to determine the credibility of the witnesses, to weigh the witness testimony, to resolve conflicts in the evidence, and to draw reasonable inferences that flow from the evidence. *People v. Williams*, 193 Ill. 2d 306, 338 (2000); *People v. Young*, 128 Ill. 2d 1, 49 (1989). Reviewing courts must give due consideration to the reality that the trier of fact saw and heard the witnesses and the evidence firsthand. *People v. Smith*, 185 Ill. 2d 532, 541 (1999). Ultimately, "[t]he testimony of a single witness, if it is positive and the witness credible, is sufficient to convict." *Id*. Furthermore, a conviction may be sustained solely on circumstantial evidence as well as upon direct evidence. *People v. Patterson*, 217 Ill. 2d 407, 435 (2005). A defendant's conviction will only be overturned based on insufficient evidence where the proof is so improbable or unsatisfactory that a reasonable doubt as to the defendant's guilt remains. *Williams*, 193 Ill. 2d at 338.

¶ 38    First, we address defendant's contention that the State's evidence, even viewed in the light most favorable to the State, failed to establish defendant possessed or discharged a firearm on the night in question, an element common to counts I-VII. On appeal, defendant does not deny that the State's evidence was sufficient to prove that he was at the scene when the shooting took place. Instead, defendant maintains the State's evidence did not place the firearm in his hand or prove he aimed and fired the weapon causing a bullet to graze Washington.

¶ 39    A brief review of the State's evidence is necessary. During the initial moments of the 911 call, Washington told the dispatcher "Delrick Rutherford" was outside of her vehicle, "acting a fool," and was threatening her. At 46 seconds into the recording, in a quiet, muffled, voice Washington appears to tell the dispatcher that defendant told her he's going to "kill me."

¶ 40    Thereafter, Washington asked the dispatcher if she wanted to hear defendant yelling at Washington. Next, sounds of shuffling or movement can be heard before Washington announced

12

she had been shot in the head. Washington gave a partial description of defendant's license plate, a description of his vehicle, and the route of travel as defendant drove away from the scene. Washington told the dispatcher that "Delrick" was the shooter, spelled his name for the dispatcher, and stated that defendant had a gun on him as he fled the scene.

¶ 41　　In addition to the 911 recording, the jury was able to view People's exhibit No. 3, a photograph depicting a bullet hole in driver's side window at head level, People's exhibit No. 4, a photograph depicting two bullet holes in the driver's side of the windshield and one bullet strike on the front A-pillar next to the driver's door, People's exhibit No. 5, a photograph depicting a bullet hole in the back passenger side window of the vehicle, People's exhibit No. 6, a photograph depicting a bullet laying on the driver's seat of the vehicle, and People's exhibit No. 15, a photograph depicting a bullet on the passenger side floorboard. With the exit hole in the back passenger's window, all other bullet strikes were located in the area surrounding the driver's seat.

¶ 42　　Further, the jury received evidence of the text message Washington sent to her sister moments after the shooting. In the text message to Alexis, Washington told her sister that "Delrick" shot her "3xs" in the head and shoulder. The information Washington shared in the text message and the events captured by the 911 recording were entirely consistent.

¶ 43　　In addition, the jury heard Washington admit that she told Officer Flynn at the scene that defendant approached the driver's side of her vehicle, told Washington he would kill her, pulled a black handgun out of his waistband, and pointed it at her with both hands. During her testimony, Washington admitted telling two paramedics at the scene and a nurse at the hospital that her ex-boyfriend shot her. While she recanted or explained her statements and the contents

13

of her text message, the jury was charged with the duty of weighing Washington's credibility in order to determine whether either version of the shooting Washington provided was credible.

¶ 44      Washington's identification of defendant's presence at the scene was corroborated by the discovery of a black cellular telephone recovered in the driveway of the residence. The cellular telephone had the same SKU number as the Boost Mobile telephone box later located in defendant's truck.

¶ 45      Washington's son also testified before the jury that defendant hurt Washington with a gun. We acknowledge the child's credibility was weakened when he admitted that he did not actually see the weapon or see defendant fire a weapon. However, as the trier of fact, the jury remained in a superior position to determine the credibility of the witnesses, weigh the witness testimony, and resolve conflicts in the evidence.

¶ 46      Next, defendant argues that even assuming that he fired the shots, the State's evidence did not establish an intent to kill. It is well established that to obtain a conviction for attempt first degree murder, the State must show that defendant possessed criminal intent to kill the victim. *People v. Green*, 339 Ill. App. 3d 443, 451 (2003). "Intent is a state of mind which can be inferred from surrounding circumstances." *People v. Richardson*, 104 Ill. 2d 8, 12 (1984). Such surrounding circumstances may include the character of the assault and the use of a deadly weapon (*Green*, 339 Ill. App 3d at 451)); *People v. Strickland*, 254 Ill. App. 3d 798, 808 (1993)), and the nature and seriousness of the injury (*People v. Williams*, 165 Ill. 2d 51, 64 (1995)). Firing a gun at a person supports the conclusion that the shooter is intending to kill. *Strickland*, 254 Ill. App. 3d at 808.

¶ 47      In support of his argument that the State's evidence was insufficient on the issue of defendant's intent to kill, defendant directs our attention to the trial judge's observation,

14

expressed during the sentencing hearing, that "I don't want you to think, although it doesn't matter, that anybody believed that you were out to kill her." Defendant's reliance on the trial judge's statement is not persuasive because it was the jury's task to construe defendant's intent.

¶ 48     Defendant also submits that his decision to swiftly leave the area following the shooting supported the inference that he did not intend to kill. Defendant asserts that if the assailant intended to kill Washington, the assailant would have remained at the scene to ensure Washington's death. Again, it was the jury's task to decide the relevance, if any, of defendant's flight following the shooting.

¶ 49     The case law provides that discharging a firearm in the direction of another person, at close range, supports, but does not definitively establish, the conclusion that the individual doing the shooting intended to kill. See *People v. Ephraim*, 323 Ill. App. 3d 1097, 1110 (2001). Here, the State's evidence went beyond proving the firing of a gun, at close range, near Washington who was seated in her vehicle.

¶ 50     As summarized above, the physical evidence documented multiple bullet strikes/holes in the windshield, A-pillar, and the driver's side window, along with Washington's physical injuries. The bullet holes all appeared to be at head or heart level. Two bullets were recovered inside the vehicle, including one on the driver's seat, after the shooting. Further, the trajectory of one bullet could be inferred by the exit bullet hole through the rear passenger's window. This physical evidence was strong circumstantial evidence of intent to kill.

¶ 51     Finally, Washington admitted telling law enforcement that defendant told her he was going to kill her. Her prior statement to the police is consistent with her muffled words, that can be heard at 46 seconds into the recording, when Washington appears to tell the dispatcher that defendant told her he was going to kill her. Based on the evidence presented to this jury, we

15

conclude any rational trier of fact could have found the defendant guilty beyond a reasonable doubt of counts I-VI.

¶ 52    However, we agree with defendant's contention that the State's evidence was insufficient to prove defendant intended to endanger the life or health of a child beyond a reasonable doubt. Section 12C-5(a)(1) provides that a person is guilty of endangering the life or health of a child when he or she knowingly "causes or permits the life or health of a child under the age of 18 to be endangered." 720 ILCS 5/12C-5(a)(1) (West 2016). The parties have not been able to direct this court to any direct or circumstantial evidence proving defendant knew his young son was in the back seat of Washington's vehicle at the time defendant fired the bullets that grazed Washington's head/neck and shoulder. We conclude the State's evidence was insufficient pertaining to count VII and reverse defendant's conviction on that count. Next, we consider the evidentiary rulings defendant contests on appeal.

¶ 53                          B. The Trial Court's Evidentiary Rulings

¶ 54    Defendant argues that the trial court erred by permitting the State to introduce various out-of-court statements that should have been excluded. The out-of-court statements that defendant challenges include Alexis's testimony about the text message Washington admitted sending; Vasquez's testimony about statements Washington made during the June 4, 2017, interview; and Washington's young son's recorded interview. Defendant concedes these issues were not properly preserved for our review but argues forfeiture is excused by plain error.

¶ 55    We review unpreserved errors under the plain error doctrine where clear error occurred and the evidence is closely balanced, or where the error is so serious as to affect the fairness of defendant's trial and challenge the integrity of the judicial process. *People v. Belknap*, 2014 IL 117094, ¶ 48; *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007). Defendant requests our court to

16

find first prong plain error exists because the evidence was closely balanced. Defendant does not assert structural error exists due to evidentiary rulings.

¶ 56        Before addressing whether the evidence at trial was closely balanced, we briefly observe that some out-of-court statements contained in the record, including Washington's emergency call to 911, qualify as excited utterances that fall within an exception to the hearsay rule. See *People v. Sutton*, 233 Ill. 2d 89, 107 (2009). However, we need not address each evidentiary question individually if the evidence at trial was not closely balanced.

¶ 57        Well established case law holds that the evidence is closely balanced where, at the close of the witness's testimony, the trier of fact is faced with two different versions of events, both of which are credible. *People v. Naylor*, 229 Ill. 2d 584, 607-08 (2008). Similarly, where the defense is predicated on a version of the facts that is not supported by the evidence, common sense applies, and the matter will not be considered to be closely balanced. *People v. Belknap*, 2014 IL 117094, ¶¶ 52-62. The extensive and compelling evidence included, but was not limited to, the contents of Washington's contemporaneous 911 call, physical evidence of the location of bullet strikes, and Washington's son's testimony.

¶ 58        The only evidence supporting a competing version of the events can be found in Washington's attempt to recant her prior out-of-court statements identifying defendant as the shooter. During trial, Washington described seeing muzzle flashes originating from behind the defendant which caused her to change her mind about whether defendant shot her. Washington explained her prior statements identifying defendant as the gunman were not accurate and were improperly influenced by her anger. During her testimony before the jury, Washington stated as follows: "Because me or my son could have lost our life. That's why I blamed [defendant], because it resulted from an argument. Had I not had the argument outside with [defendant] I

17

don't think me or my son would have came near death." At the time of the jury trial, Washington testified that she believed defendant was *not* the gunman but was the intended target of some other person standing behind defendant at the time of the shooting.

¶ 59    In this case, we conclude there is no plausible evidence supporting this theory and the evidence was not closely balanced at all. Therefore, we conclude plain error does not apply or excuse defendant's forfeiture of the contested evidentiary issues.

¶ 60                              C. Defendant's Prior Conviction

¶ 61    Defendant next argues the trial court erroneously informed the jury that defendant had previously been convicted of a "forcible" felony. Defendant, who has previously been convicted of involuntary manslaughter, argues involuntary manslaughter is not a "forcible" felony as defined under section 2-8 of the Criminal Code of 2012 (the Code). 720 ILCS 5/2-8 (West 2016). The State argues defendant forfeited this argument because defendant stipulated for purposes of the jury trial that involuntary manslaughter was a "forcible" felony.

¶ 62    In this case, defendant's former conviction was relevant to count VI, which alleged that on or about June 4, 2017, defendant knowingly had in his possession a handgun, and defendant had previously been convicted of the forcible felony of involuntary manslaughter in Peoria County case No. 04-CF-731, a case which involved the use of physical force upon another person that resulted in the death of that person. The "forcible" language contained in count VI signified the State's intent to seek a sentencing enhancement under section 24-1.1(e) of the Code. 720 ILCS 5/24-1.1(e) (West 2016).

¶ 63    We recognize that section 111-3(c) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(c) (West 2016)) instructs that the jury should not hear evidence of the nature of defendant's prior conviction where the nature of the conviction is merely relevant to the

18

sentencing enhancement, instead of being an element of the crime. Consequently, immediately before the jury trial began, the court queried the parties as to how they would like to address the element pertaining to defendant's prior conviction in front of the jury.

¶ 64        Defense counsel did not want the specifics of defendant's prior felony revealed to the jury. Defense counsel explained that he would stipulate to defendant having a prior felony conviction. The State responded that the stipulation needed to be to a "forcible" felony, "because that raises this to a Class 2 felony rather than a Class 3 unlawful possession of a weapon by a felon ***."

¶ 65        After some discussion with the court, the parties agreed that the court could inform the jury that defendant had been "previously convicted of a forcible felony." Consistent with this agreement, at the close of the State's case, the State moved to admit a certified copy of defendant's prior felony conviction. Defense counsel did not object, and instead stated "we acknowledge that [defendant] has a prior felony conviction." The trial court advised the jury that the certified copy "will not go back to you, but it will be entered into the record as the following: That the defendant, Delrick Rutherford, has on a previous occasion been convicted of a forcible felony in Illinois." Presumably, defense counsel did not object because the trial court's announcement reflected the prior stipulation between both parties.

¶ 66        Based on the totality of the conversation between the parties, it is apparent that defendant stipulated to his former felony conviction as "forcible" in nature and otherwise failed to object to the "forcible" language contained in the stipulation language. Since the first prong of the plain error doctrine does not apply because the evidence was not closely balanced, the issue of whether the trial court erred by employing the language that the parties agreed upon has been forfeited.

19

However, the issue of whether defense counsel was ineffective due to the agreed use of the term, "forcible", remains as a plausible contention of error.

¶ 67                                    D. Ineffective Assistance of Counsel

¶ 68        Lastly, defendant asserts that defense counsel's performance was clearly deficient and substandard in many respects. Defendant directs our attention to defense counsel's puzzling decision to allow a stipulation describing his prior felony conviction as a "forcible" felony. In addition, for purposes of this appeal, defendant contends that defense counsel should have insisted on the severance of counts VI and VII from the other charges. Defendant points out other purported deficiencies in defense counsel's performance, including the failure to submit or request two additional limiting jury instructions. The State contends that defense counsel's decisions were either a matter of sound trial strategy or, if improper trial strategy, the errors were not prejudicial.

¶ 69        In order to demonstrate ineffective assistance of counsel, a defendant must show: (1) that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and (2) that there is a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different. *People v. Manning*, 241 Ill. 2d 319, 326 (2011); *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Matters of trial strategy are generally immune from ineffective assistance claims. *Manning*, 241 Ill. 2d at 327.

¶ 70        This record makes it difficult to resolve these issues because the record does not contain an adequate explanation for defense counsel's decisions, making speculation about trial strategy necessary. In cases such as this, the prudent approach would be to evaluate defense counsel's representation after developing a more complete record in a collateral context following a properly filed petition for postconviction relief. *People v. Veach*, 2017 IL 120649, ¶ 46.

20

Accordingly, we are unable to reach the merits or resolve the claims regarding ineffective assistance of defense counsel until the record is adequately developed for appellate review.

¶ 71　　　　Finally, defendant briefly asserts that the cumulative effect of the alleged judicial errors prevented this defendant from receiving a fair trial. Even if we assumed all defendant's allegations of judicial error had merit, and we considered such errors collectively, we conclude those alleged judicial errors did not result in an unfair proceeding in light of the overwhelming evidence of defendant's guilt.

¶ 72　　　　　　　　　　　　　　　III. CONCLUSION

¶ 73　　　　The judgment of the circuit court of Peoria County is affirmed in part and reversed in part.

¶ 74　　　　Affirmed in part and reversed in part.